# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1824-24

J.L.G.,[1]

    Plaintiff-Respondent,

v.

H.S.,

    Defendant-Appellant.

_____

        Submitted August 11, 2026 – Decided August 14, 2026

        Before Judges Firko and Puglisi.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FV-11-0809-25.

        Sanvenero & Cittadino LLC, attorneys for appellant (Louis J. Keleher, on the brief).

        Respondent has not filed a brief.

PER CURIAM

---

[1] We use initials to protect the victim. See R. 1:38-3(d)(10).

In this one-sided appeal, defendant H.S. appeals from a January 29, 2025 final restraining order (FRO) entered against her pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. A Family Part judge entered the FRO based upon his findings defendant committed the predicate act of harassment, N.J.S.A. 2C:33-4, against plaintiff J.L.G., and that an FRO is necessary to protect plaintiff from future acts of domestic violence. On appeal, defendant argues there is insufficient evidence supporting the judge's findings she committed the predicate act of harassment, and the judge erred by concluding an FRO is necessary to protect plaintiff from future acts of domestic violence. Defendant also contends the judge erred when he failed to allow defendant to present a witness in her defense. Unconvinced, we affirm.

I.

The facts were presented at the one-day hearing conducted in January 2025. Plaintiff was represented by counsel, and defendant was self-represented. Plaintiff and defendant were the only individuals who testified. The parties dated for five-and-one-half years before ending their relationship in October 2024. The parties resided together during the entire time of their relationship.

On December 10, 2024, plaintiff filed a complaint and obtained a temporary domestic violence restraining order (TRO) against defendant.

2

Plaintiff alleged defendant committed the predicate act of harassment. In pertinent part, the complaint alleged plaintiff's "neighbor informed her that a friend called her and advised . . . defendant said she would ruin plaintiff's life." Plaintiff claimed she construed defendant's "communications as a threat to harm her." On December 5, 2024, defendant had allegedly texted plaintiff, "F*** it, I might just stay here and pay half. F*** having peace and respecting your space, it's my place too."

According to plaintiff's complaint, defendant had moved out of their apartment on November 26, 2024. Plaintiff alleged she was "in fear of her safety" if defendant returned to the apartment. Plaintiff claimed defendant threatened to make her ex-husband aware that plaintiff had two abortions when defendant knew plaintiff only had one abortion and plaintiff's ex-husband did not know about it. Plaintiff alleged defendant "is aware that plaintiff's ex-husband is aggressive," and "he may have a violent reaction if he finds out about the abortion." Plaintiff alleged defendant "took off the Ring cameras." The complaint also alleged defendant committed prior acts of domestic violence against plaintiff.

At the ensuing trial, plaintiff and defendant offered differing versions of the events leading to plaintiff's filing of her complaint and the court's issuance

A-1824-24

of the TRO.  Plaintiff testified her relationship with defendant became "tumultuous."  Plaintiff recalled an incident in June 2023, when defendant "ripped" her phone out of her hand and "threw it into a wall."  In September 2024, plaintiff described an incident where the parties were having "a very heated argument," and defendant threw a "gumball machine into the wall," which created "a huge dent in the wall."[2]

Plaintiff explained when the parties broke up, defendant held plaintiff by her "legs to try and wrestle [her] when she attempted to leave."  Plaintiff stated she informed defendant she was "going to a hotel to get away from the situation."  As a result of defendant grabbing plaintiff's legs, she sustained a "bruise," as depicted by a photograph moved into evidence.  Plaintiff testified defendant called her "six times" in "the middle of the night" and took screenshots of the calls, which were admitted into evidence.

In terms of prior history, plaintiff testified that on one occasion, defendant "picked up the coffee table and chucked it across the room."  Plaintiff stated defendant picked up a "shoe rack and chucked it at the wall" while plaintiff sat on the floor crying.  Plaintiff described defendant drew "devil horns and a tail"

---

[2] The judge noted the gumball machine incident would not to be included in the complaint.

on three people in a picture sitting next to plaintiff based on Ring camera footage she reviewed. A photograph of the picture was moved into evidence.

Plaintiff testified she stayed at a hotel and other places because she was "scared" defendant would return to the apartment. After defendant moved out, plaintiff stated she resumed living in the apartment. Plaintiff observed defendant removing the Ring cameras and "confronted" her about it. Plaintiff testified defendant "admitted" she removed them.

Plaintiff stated defendant "threatened" to call her ex-husband and tell him about an abortion she had without his knowledge. Plaintiff confirmed her ex-husband was contacted by defendant and that he was "sitting outside the courtroom right now." According to plaintiff, defendant threatened to move back into the apartment. Plaintiff testified the parties had "plenty of arguments" filled with "rage," causing her to become "nervous" that defendant would "hurt" her because defendant "had [done so] in the past with an ex." Plaintiff stated defendant put her in "fear" as a result of her actions "[m]ultiple times."

The judge provided defendant with an opportunity to cross-examine plaintiff, but she declined to do so. Regarding the allegations in the complaint, defendant testified that plaintiff's family and friends "have always picked on [her]," and plaintiff's cousin always wanted to "fight" her and threw a "cigarette"

5

at her face. Defendant testified she did not think the damage to the wall came from throwing the phone because "there were plenty of holes already" in the room. Defendant admitted to grabbing the gumball machine but claimed she "never aimed it towards [plaintiff]."

Defendant testified she was unsure if the bruises on plaintiff's legs were caused by her and stated she did not "grab" plaintiff but "literally just hugged her by the feet begging for her not to leave" in an effort to "work out the relationship." According to defendant, plaintiff "easily bruises." Defendant explained the parties were supposed to get married two weeks before, and she was "emotionally distraught" because plaintiff was "spending time with [their] neighbor." Defendant conceded she placed markings on the photograph of plaintiff and her friends and took down the Ring cameras to "reset them to remove [her] access," but left the cameras there because plaintiff had purchased them.

Defendant acknowledged she went to meet plaintiff's ex-husband "[b]ecause he had experienced the same exact thing that [she] did with [plaintiff]." She admitted making a "disclo[sure]" to plaintiff's ex-husband about plaintiff's abortion on December 10, 2024. Defendant denied pinning down plaintiff.

On cross-examination, defendant confirmed she went to the hotel where plaintiff was staying and wanted to "catch" her and the neighbor "in action" together. Defendant testified she never acted "with any sort of violence" towards plaintiff and does not have any "anger management problems." She did not recall ever grabbing plaintiff's phone. Defendant admitted texting plaintiff about staying in the apartment and "swip[ing]" the gumball machine off the table during an argument about the neighbor.

The judge found jurisdiction under the PDVA based on the parties' dating relationship. He found plaintiff's testimony more credible than defendant's version of the events. In support of the judge's credibility determination, he relied on plaintiff's testimony and found the photographs, screenshots, and text messages corroborated her version of the events.

The judge determined the events that transpired at the hotel were in line with a "disappointed suitor situation." However, the judge found there was "no justification" for defendant threatening and following through on disclosing "some private information to plaintiff's ex-husband." The judge reasoned defendant had only one purpose in disclosing this information—"to alarm, annoy[,] or intimidate [plaintiff] because of [their] breakup." The judge

7

observed defendant believed plaintiff "had been unfaithful to her" and still "felt angered" three weeks after their breakup.

The judge found plaintiff proved the predicate act of harassment. Although not precisely articulated, we understand the judge found defendant committed predicate acts of harassment by making communications in a manner likely to cause annoyance or alarm, N.J.S.A. 2C:33-4(a), and by engaging in a course of conduct with the purpose to cause alarm or seriously annoy plaintiff, N.J.S.A. 2C:33-4(c).

The judge noted the prior history of domestic violence between the parties "tended to escalate" into "physicality" and "throwing things." The judge also determined an FRO was necessary to prevent "any reoccurrence of continued overtures" by defendant or "vindication." The judge entered an FRO against defendant. This appeal followed.

## II.

Generally, "findings by a trial court are binding on appeal when supported by adequate, substantial, credible evidence." Gnall v. Gnall, 222 N.J. 414, 428 (2015). "We accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise between

8

couples.'" C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020) (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)). "[D]eference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" MacKinnon v. MacKinnon, 191 N.J. 240, 254 (2007) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)).

We will not disturb a trial court's factual findings unless "they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). However, we do not accord such deference to legal conclusions and will review such conclusions de novo. Thieme v. Aucoin-Thieme, 227 N.J. 269, 283 (2016).

The purpose of the PDVA is to "assure the victims of domestic violence the maximum protection from abuse the law can provide." G.M. v. C.V., 453 N.J. Super. 1, 12 (App. Div. 2018) (quoting State v. Brown, 394 N.J. Super. 492, 504 (App. Div. 2007)); see also N.J.S.A. 2C:25-18. Consequently, "[o]ur law is particularly solicitous of victims of domestic violence," J.D., 207 N.J. at 473 (alteration in original) (quoting State v. Hoffman, 149 N.J. 564, 584 (1997)),

and courts will "liberally construe[] [the PDVA] to achieve its salutary purposes." Cesare, 154 N.J. at 400.

To determine whether the entry of an FRO is appropriate, the court must first "determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19[(a)] has occurred." Silver v. Silver, 387 N.J. Super. 112, 125 (App. Div. 2006). If the court finds the defendant committed a predicate act of domestic violence, then the second inquiry "is whether the court should enter a restraining order that provides protection for the victim." Id. at 126. While the second inquiry "is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29[(a)](1) to -29[(a)](6), to protect the victim from an immediate danger or to prevent further abuse." Id. at 127; see also J.D., 207 N.J. at 475-76.

A.

Defendant claims there is insufficient evidence supporting the judge's finding she committed the predicate act of harassment. More particularly, she argues the record lacks evidence she acted with the purpose to harass plaintiff. Defendant further argues the evidence does not support a finding she acted in a

manner likely to cause annoyance or alarm to plaintiff in violation of N.J.S.A. 2C:33-4(a), or that she engaged in a course of alarming conduct or repeatedly committed actions with the purpose to cause alarm or seriously annoy plaintiff in violation of N.J.S.A. 2C:33-4(c). She maintains the actions described by plaintiff are more accurately characterized as "ordinary domestic contretemps" as opposed to domestic violence.

Although harassment is "one of the most frequently reported" predicate acts of domestic violence, it also "presents the greatest challenges to our courts." J.D., 207 N.J. at 475. A harassment claim presents such a challenge because it "confounds [the court's] ability to fix clear rules of application" between "acts that constitute harassment" and acts that are "ordinary domestic contretemps." L.M.F. v. J.A.F., 421 N.J. Super. 523, 534 (App. Div. 2011) (quoting J.D., 207 N.J. at 475). To determine whether conduct constitutes harassment in the domestic violence context, a court must consider the parties' prior relationship. Cesare, 154 N.J. at 405.

Only by considering the parties' prior relationship and the parties' conduct under the totality of the circumstances can a court determine whether a communication constituted harassment. Compare Pazienza v. Camarata, 381 N.J. Super. 173, 182-84 (App. Div. 2005) (finding, based on the defendant's

repeated prior unwanted contact with the plaintiff, that a single text message to the plaintiff about the show she was watching at the moment defendant sent the text message constituted harassment), with L.M.F., 421 N.J. Super. at 535-37 (holding an isolated incident of the defendant making a remark to the plaintiff when he was angry in the midst of their divorce was not harassment).

In relevant part, a person commits the offense of harassment if, with purpose to harass another, he [or she]:

> (a) [m]akes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> . . . .
>
> (c) [e]ngages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.
>
> [N.J.S.A. 2C:33-4(a), (c).]

Critical to this analysis is whether the defendant's actions were taken with a purpose to harass. R.G. v. R.G., 449 N.J. Super. 208, 226 (App. Div. 2017). "'[P]urpose[]' . . . is the highest form of mens rea contained in our penal code, and the most difficult to establish." State v. Duncan, 376 N.J. Super. 253, 262 (App. Div. 2005). "A person acts purposely with respect to the nature of his [or her] conduct or a result thereof if it is his [or her] conscious object to engage in

conduct of that nature or to cause such a result." Ibid. (quoting N.J.S.A. 2C:2-2(b)(1)). We may infer "a 'purpose to harass another' 'from the evidence presented' and from 'common sense and experience.'" Ibid. (quoting Hoffman, 149 N.J. at 577).

Here, the evidence amply supports the judge's finding defendant made communications likely to cause annoyance or alarm with the purpose to alarm and seriously annoy plaintiff. Defendant's purpose is established by her own words and conduct. Plaintiff's unrefuted testimony established defendant threatened to call her ex-husband and tell him about her abortion and followed through with this threat. Thus, defendant engaged in conduct that was consistent with her stated intention and with knowledge it would frighten plaintiff. See J.D., 207 N.J. at 478.

Plaintiff ended her relationship with defendant and cancelled the wedding. Defendant suspected plaintiff was spending time with a neighbor and saw them together at the hotel. The record shows defendant's response to plaintiff's decision to end their relationship was her attempt to exercise power over plaintiff by controlling the disclosure of her abortion, a personal matter of which she was entitled to privacy. As plaintiff aptly alleged in her complaint,

13

defendant weaponized the disclosure of plaintiff's abortion in response to being rebuffed and rejected.

Defendant also knew disclosure of plaintiff's abortion to her ex-husband would cause plaintiff annoyance and alarm. Plaintiff claimed defendant was "aware" plaintiff's ex-husband "is aggressive" and that he "may have a violent reaction" if he found out about the abortion. Defendant's unilateral and unauthorized disclosure of plaintiff's action to her ex-husband constituted a heinous assault on plaintiff's privacy that was clearly intended to cause her serious annoyance and alarm for which there is no rational explanation. See Duncan, 376 N.J. Super. at 262 (permitting inference of purpose to harass based on the evidence and common sense and experience). Defendant's communication disclosing plaintiff's abortion served no other purpose.

Defendant claims this was "simply a bad breakup with a lot of people involved." However, the judge found defendant's version less credible, and instead, concluded that her purpose was to cause plaintiff serious annoyance or alarm. Defendant's assertion her actions constituted ordinary domestic contretemps is undermined by the record. We defer to the judge's credibility findings and conclude there is substantial credible evidence supporting the

judge's determination defendant committed the predicate act of harassment in violation of N.J.S.A. 2C:33-4(a) and (c).

B.

Defendant argues the judge erred in finding plaintiff requires an FRO to prevent future acts of domestic violence because she did not commit a predicate act of domestic violence in the first instance. We reject that argument for the reasons already stated. Defendant also maintains plaintiff failed to satisfy the second Silver prong because she did not provide any testimony as to why she needed an FRO. According to defendant, plaintiff never proved her "need" for an FRO.

A finding that a defendant committed a predicate act does not "automatically mandate[]" the entry of an FRO. Silver, 387 N.J. Super. at 126-27 (quoting Kamen v. Egan, 322 N.J. Super. 222, 227 (App. Div. 1999)). Where a predicate act is found, the evidence must establish the defendant "subjected [the victim] to potential abusive and controlling behavior" as a result of the parties' previous domestic relationship. R.G., 449 N.J. Super. at 229 (quoting Tribuzio v. Roder, 356 N.J. Super. 590, 597 (App. Div. 2003)). "Although a defendant might not use direct physical violence when he or she engages in the predicate act[] of harassment, N.J.S.A. 2C:33-4, . . . [this] act[] can cause great

emotional harm and psychological trauma." <u>A.M.C. v. P.B.</u>, 447 N.J. 402, 417 (App. Div. 2016).

We also reject defendant's argument her conduct was part of mere "ordinary domestic contretemps," <u>Corrente v. Corrente</u>, 281 N.J. Super. 243, 250 (App. Div. 1995), and were "trivial and petty communications between separated" parties, <u>J.N.S. v. D.B.S.</u>, 302 N.J. Super. 525, 532 (App. Div. 1997). Of course, ordinary disputes between parties do not constitute domestic violence and therefore do not warrant issuance of an FRO. <u>J.D.</u>, 207 N.J. at 475-76.

Defendant's argument ignores that her communication disclosing plaintiff's abortion to her ex-husband occurred after plaintiff ended their romantic relationship and her request to be left alone. Thus, defendant's actions were not domestic contretemps but rather comprised a conscious effort to disclose private and sensitive information she knew plaintiff did not want shared, and she understood would cause plaintiff fear and emotional harm. The record amply supports the judge's finding an FRO is necessary to protect plaintiff against future acts of domestic violence.

III.

We reject defendant's argument she was denied due process when the judge failed to allow her to present her witness in her defense. Defendant argues

A-1824-24

that after her examination was completed, the judge did not provide her with the opportunity to call her witness "as previously reported . . . to the [judge] and [p]laintiff's counsel . . . and instead went straight to plaintiff's closing argument."

The denial of the opportunity to cross-examine or present witnesses violates due process. Peterson v. Peterson, 374 N.J. Super. 116, 124-26 (App. Div. 2005). However, "[t]he conduct of a trial . . . is within the discretion of the trial court." Persley v. N.J. Transit Bus Operations, 357 N.J. Super. 1, 9 (App. Div. 2003). This discretion is not disturbed "unless there is a clear abuse of discretion which has deprived a party of a fair trial." Ibid. The judge has broad authority to "exercise reasonable control over the mode . . . of interrogating witnesses," N.J.R.E. 611(a), and to avoid wasting time, N.J.R.E. 611(a)(2). These limits, however, must not deprive a party of their right to due process by prohibiting one party from presenting relevant witnesses or from cross-examining other witnesses. Peterson, 374 N.J. Super. at 125-26.

We conclude the judge did not abuse his discretion in not allowing defendant's witness to testify. In her merits brief, defendant does not identify who the purported witness is. At the onset of the hearing, defendant stated she planned on testifying and had one witness. However, defendant did not disclose

who the witness was or the proffered testimony. Moreover, defendant did not request to have the witness testify after she completed her testimony.

We defer to the judge's discretion in conducting the FRO hearing and considerations of safety, time, and cumulative testimony. See State v. Budis, 125 N.J. 519, 532 (1991). In any event, the outcome would not have been affected based on the overwhelming substantial credible evidence in the record supporting the issuance of the FRO.

Any arguments asserted on defendant's behalf that we have not addressed directly are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-1824-24